THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY v. HENRY J. CROLL.

No. 74.

1. INJURY FROM RAILROAD—*Negligence not Proved.* Where a railroad-track is a good, rock-ballasted track, and in good order, except low joints in places caused by the ground being wet and the frost coming out of the ground, and where this cannot be helped in railroading, and where trains are safely run over the track as fast as 40 or 50 miles per hour, *held*, that such condition of the track does not of itself establish negligence on the part of the company toward its employees who are working near said track

2. ———— *Insufficient Evidence.* Where a lump of coal rolls from the top of the tender, loaded rounding with coal, and the coal which is above the flange of the tender in no way contributes to the injury, no negligence is established by the fact that coal is piled above the flange.

3. ——— *Negligence of Co-employees.* Evidence which establishes the fact that coal is piled up rounding on a tender even to the height of two or three feet, which is claimed to be the usual way of loading coal, or about the way coal is generally loaded, does not establish negligence upon the part of the employees of the company in loading the coal upon the tender.

MEMORANDUM.—Error from Osage district court; WILLIAM THOMSON, judge. Action by Henry J. Croll against The Atchison, Topeka & Santa Fe Railroad Company to recover damages for personal injuries. Judgment for plaintiff. Defendant brings the case to this court. Reversed. The opinion herein, filed May 8, 1896, states the material facts.

*A. A. Hurd, O. J. Wood,* and *W. Littlefield,* for plaintiff in error.

*Robert C. Heizer,* for defendant in error.

The opinion of the court was delivered by

DENNISON, J.: This action was brought in the district court of Osage county by Henry J. Croll against the Atchison, Topeka & Santa Fe Railroad Company to recover damages for injuries received by him while he was engaged in working for said company. While said Croll was working in a ditch along and about 8 or 10 feet from the rails of the said road a passenger train passed, and a lump of coal weighing 12 or 15 pounds rolled from the tender of the engine which was pulling said train, and bounding from the ground struck said Croll on the head and face, injuring the muscles of his eyelid so that he cannot raise it in a natural way, and otherwise injured him. The case was tried with a jury, and a verdict and judgment were rendered against said company for the sum of $1,850, and it brings the case here for review.

One of the assignments of error is that the court erred in overruling the demurrer of the defendant below to the evidence of the plaintiff below. Croll seeks to recover from said company because of the negligence of its employees in not having kept the track in good condition, and because of their carelessly loading the coal into and upon the tender of the engine. It devolved upon said Croll to prove such negligence, and if he failed so to do the demurrer should have been sustained. Admitting all the evidence of the plaintiff below to be true, is said company guilty of negligence, and, if so, of what does it consist? The only contention of counsel for Croll is that the company was negligent in failing to keep the track in good repair, and in loading the tender with coal in an unusual and careless manner. We have made a very careful examination of the testimony of Croll's witnesses, and find the following evidence relative to the condition of the track:

Croll himself testified as follows:

"Ques. You observed the track along there? Ans. Yes, sir.

"Q. When working on the section your business was to raise up the track, put in ties, and surface up and such work? A. Yes, sir.

"Q. Being accustomed to it, you would naturally notice the track when you were at work? A. More or less; yes, sir.

"Q. Had you ever seen this train pass there before that day? A. Yes, sir; I suppose I did.

"Q. Had it passed there every day while you were at work? A. I think it had.

"Q. Did it run pretty fast each day? A. Yes, sir.

"Q. Did you notice it as it passed you on the days before whether the track was rough there or not? A. Yes, sir.

"Q. Well, what was it? Did it appear to be rough there? A. It appeared to be rough.

"Q. For how long a time had you known that? A. I do n't know.

"Q. For several days? A. Yes, sir.

"Q. What was the effect of that on the engine? Did it swing? A. Yes, sir.

"Q. You had noticed it before? A. Yes, sir.

"Q. Did you notice it on this day? A. No, sir.

"Q. Had you talked about the track being rough there before that with other men? A. I do n't know but we had; there had been some remarks made.

"Q. It was early spring and the frost had come out? A. Yes, sir.

"Q. Did n't that tend to soften the track and make it rough? A. Yes, sir.

"Q. You know that fact? A. Yes, sir.

"Q. Had it not been pretty soft for several days before you was hurt? A. I can't say.

"Q. It had been, though, in about that condition for several days? A. Yes, sir; I think so."

James Hampson also testified, as follows:

"Ques. How was the track there in reference to the condition of the ground? Ans. The track had been rough.

"Q. How was the condition of the track there at this time? A. Pretty rough.

"Q. What made it rough? A. The frost coming out of the ground, and rain.

"Q. How is that track generally when the company surfaced up? A. It was a good road.

"Q. Whether or not is that a thing that cannot be avoided in railroading? A. Yes, sir.

"Q. How was it a week previous to that, in comparing the condition of the track? A. About the same."

Albert Mayer's testimony is as follows:

"Ques. The road, so far as the track is concerned, was in the same condition there for days prior to what it was at this time? Ans. Yes, sir.

"Q. Is the road all along there ballasted with rocks? A. Yes, sir.

"Q. As much as four feet above? A. Yes, sir.

"Q. That is a straight track? A. Yes, sir.

"Q. Was it ballasted between the rails, too? A. Yes, sir.

"Q. That kind of ballasting made a pretty good track? A. It did, except in bad weather, when the frost come out of the ground.

"Q. That could not be prevented, could it? A. No, sir; I suppose not.

"Q. It was what is called a good road generally? A. Except for low joints.

"Q. What causes that? A. Frost.

"Q. When the track settles, it softens by the frost coming out? A. Yes, sir."

This is in substance all of the testimony introduced by the plaintiff as to the condition of the track, and this was all developed upon cross-examination. The counsel for Croll evidently relied upon the condition of the coal upon the tender for his act of negligence. This testimony establishes the fact that the track was a good, rock-ballasted track; that at the time the injury occurred the ground was wet and soft, and the frost was coming out of the ground; that this caused low joints in places, and that it could not be helped in railroading. The testimony shows that trains were safely run over this track as fast as 40 or 50 miles per hour. This condition of the track might have required more careful management on the part of the employees of the company, but we cannot hold that the condition of the track itself establishes negligence on the part of the company toward its employees who are working near said track.

This brings us to the main fact relied upon as establishing the negligence of the company. The coun-

sel for Croll contends that the evidence tends to prove

"that the tender from which coal fell was plainly, unusually, and negligently and carelessly loaded; that it was piled over, and out to, and above the edge of the flange, and higher up in the center of the tender than was usual and customary, two or three feet, thus making it unnecessarily and unusually dangerous, and unusually liable to fall off."

The testimony of Jacob Young, introduced by the plaintiff, Croll, upon this subject, is as follows:

"Ques. Were you present at the time the coal fell from the tender and struck this man? Ans. Yes, sir.

"Q. What were you doing at the time? A. I was ditching.

"Q. About how far were you from the train as it went by? A. About 10 or 15 feet, I judge.

"Q. How far was the engine away from you when you saw it first? A. About three-quarters of a mile.

"Q. Did you watch it as it come up and went by? A. Yes, sir.

"Q. Did you see a chunk of coal fall? A. Yes, sir.

"Q. Where did it fall from? A. About the center of the tender.

"Q. State to the jury whether or not you observed the running of the train at the time, and the manner of its running. A. It was going pretty fast.

"Q. How long have you been in the railroad business? A. Eight or 10 years now.

"Q. During these times what particular branch of the business were you engaged in? A. On the section.

"Q. Could you observe, from the running of the train, whether or not the road was rough or smooth? A. I thought it pretty rough.

"Q. You saw the coal fall from the center of the tender? A. Yes, sir.

"Q. Now tell the jury how it was. [Question objected to on the ground that it is incompetent, irrelevant, and immaterial, which objection was by the

court overruled, to which ruling of the court the defendant, by its counsel, duly excepted and still excepts.]

"Q. Could you see the coal from where you stood? A. I was half way up the bank.

"Q. How was the coal outside of the tender? A. It was sloped up.

"Q. Did it reach clear out to the flange? [Question objected to on the ground that it is leading, which objection was by the court sustained, to which ruling of the court the plaintiff, by his counsel, at the time duly excepted and still excepts.]

"Q. Explain how that was. A. It was sloped up to the flange. I could not tell exactly whether clear to the end.

"Q. Could you see the coal? A. Yes, sir.

"Q. How was it in reference to the tender where the flange was? A. It was sloped up.

"Q. Could you or could you not tell whether it was sloped clear to the flange? A. I could not tell; it was chucked up like that (witness indicating) towards the center of the tank.

"Q. About where did you see this coal leave the tank? A. From about the center of both ends.

"Q. At the top or sides? A. At the top."

CROSS-EXAMINATION.

"Q. I understand you to say the coal on the tender was rounded up? A. Yes, sir.

"Q. Was there a full load on the tender? A. I could not tell if they have boxes up next to the cab.

"Q. How far back was this on the tender that you noticed? A. About half way.

"Q. Was that about the way it was usually loaded on the tender? A. A good many are.

"Q. Had you seen them before this injury passing you loaded in that way, prior to the injury? A. Yes, sir.

"Q. Was this man at work there where you saw the engine passing loaded with coal that way? A. Yes, sir.

"Q. It was a common every-day occurrence? A. I did n't notice every day.

"Q. Well, as often as you did notice?  A. Yes, sir.

"Q. That was the usual way you saw the tenders loaded, as far as you can tell?  A. Yes, sir."

Albert Mayer testified as follows :

"Ques. Was you present when Croll was hurt? Ans. Yes, sir.

"Q. What was you doing at the time he was hurt? A. I was on top of the cut.

"Q. Did you see the engine at the time it come up? . A. Yes, sir..

"Q. About what distance was you from it at the time?  A. About 18 feet.

"Q. State whether or not you observed the condition of the coal on the tender of the engine.  A. I did ; yes, sir.

"Q. Explain to the jury how the coal was piled on the engine.  [Question objected to on the ground that it is incompetent, irrelevant, and immaterial, which objection was by the court overruled, to which ruling of the court the defendant, by its counsel, at the time duly excepted and still excepts.]

"Q. Just explain it.  A. The tender was piled full.

"Q. Did you see the coal that fell?  A. I did.

"Q. About what sized chunk of coal was it?  A. It would weigh from 12 to 15 pounds, in my estimation.

"Q. Can you tell the jury from what part of the tender it fell?  A. From the middle part.

"Q. How did it fall?  A. The tender was full, and as it rolled off it struck the rock ballast and bounded over and struck Mr. Croll in the face.

"Q. What was Mr. Croll doing at the time he was struck?  A. He was working at the space towards the north, shoveling.

"Q. About how far is this tender where the coal is, from the engineer and fireman?  Did you see them at the time?  A. I did ; yes, sir.

"Q. About how far was it, in your judgment, from where this coal was piled to the engineer and fireman? [Question objected to on the ground that it is incompetent, irrelevant, and immaterial, which objection was by the court overruled, to which ruling of the court

the defendant, by its counsel, at the time duly excepted and still excepts.]   A. About 12 feet, I judge.

"Q. Was there anything between the fireman and the engineer and that coal, between their seats and that coal, that would prevent them seeing the condition of the coal on the tender?   A. No, nothing.

"Q. State about what height the coal was piled up at the edge of the tender, if at all.   A. I should judge between two and three feet.

"Q. You mean in the center?   A. Yes, sir.

"Q. About how high was it at the outer edge of the tender where it came to the edge of the flange? A. It was above the flange; I cannot say how far.

"Q. You say you saw it fall?   A. I did."

CROSS-EXAMINATION.

"Q. You say the tender was full?   A. Yes, sir.

"Q. Is not that frequently the case, when you see them passing up the road?   A. Yes, sir.

"Q. You say that this was rounded up a little higher in the middle than at the edges?   A. Yes, sir.

"Q. It was loaded about as you have frequently seen them?   A. To a certain extent.

"Q. Was it not sloped down towards the front? A. Yes, sir; when she was full it had to naturally slope down.

"Q. Did you see it strike this man?   A. Yes, sir.

"Q. Where did it strike first when it left the tender?   A. It struck the rock ballast and then bounded, and then it struck where the workmen were.

"Q. It struck the bank before it struck him—it bounded back?   A. It made two bounds.

"Q. It bounded over on the other side of the bank, and then come back and struck him?   A. Struck him.

"Q. Was it above him where it struck the bank? A. It was below him.

"Q. Where it struck the last time, was that above or or below him when it struck on the bank higher than he was?   A. Yes, sir.

"Q. Then it fell down when it come toward him? A. Yes, sir."

Reuben Strain testified as follows:

"Ques. Did you see the chunk of coal fall?   Ans. Yes, sir.

"Q. Where did it fall from?   A. About the middle of the tender, up to about midway of the tender.

"Q. Did you make any observation of the coal, the form of the coal on top of the tender?   A. I was just stooping down and getting a shovel of dirt when I saw the engine within about 25 or 30 feet of me, and looking up saw the chunk of coal leave the tender.

"Q. Did you observe how it was piled on the tender? A. Yes, sir.

"Q. How was it?  Describe it.   A. It was rounded and very heavily loaded."

#### CROSS-EXAMINATION.

"Q. The first thing you saw was the chunk of coal coming off?   A. Yes, I saw the engine and the coal coming off.

"Q. You did not stop long enough to take a distinct view there, and take in the condition of things? A. No, sir.

"Q. Did you see where the fireman was?   A. No. sir.

"Q. In looking at that, now, did n't it appear to you that it had been rolling off to the front end of the tender?   A. It went off about middle ways.

"Q. How was it the other way?   A. About middle way.

"Q. That is your impression of it?   A. Yes, sir.

"Q. All you know about is just an impression you have got?   A. Yes, sir.

"Q. You have talked with the plaintiff about it? A. Some.

"Q. You have talked with his attorney about it? A. Some.

"Q. Do you mean to say now positively that that was a full, rounded load of coal and not used out of up to that time?   A. Yes, sir.

"Q. Do you know where they coaled up?   A. No, sir.

"Q. I think you testified that the condition of the load of coal was about the same as you noticed it on other days?  A. Yes, sir.

"Q. About the same as it was generally carried? A. Yes, sir."

Young testified that the tender was loaded the usual way; that a good many are loaded the same way; what he saw were loaded that way.   Mayer testified that the coal was above the flange of the tender, but he does not know how far, and that in the center was piled up two or three feet high, and that it was loaded to a certain extent as he had frequently seen them.   Strain testified that the tender was rounded and very heavily loaded, and that the condition of the load of coal was about the same as it was usually carried. There is no evidence tending to show that this load of coal was "unnecessarily and unusually dangerous, and unusually liable to fall off."   On the contrary, two of the witnesses testify that it was loaded as usual, and the other one testifies that it was loaded to a certain extent as he had frequently seen them, without stating wherein it differed.   Counsel for Croll contends that, as Mayer testified that the coal was above the flange, and that, as Rollo, the engineer, testified that "you could not pile coal above the flange six or eight inches and make it stay there," there is some evidence tending to show negligence on the part of the employees in loading the tender with coal.   All the witnesses who testified upon the subject say the lump of coal which injured Croll rolled from the top of the pile of coal.   The coal which was above the flange in no way contributed to the injury.   Besides this, Rollo was a witness for the defense, and did not testify until the demurrer had been overruled.   We cannot say how high coal may be piled and be safe

from rolling off, nor can we say just how coal should be loaded and be safe. There was some evidence tending to prove how the coal was loaded; but none tending to prove how it could have been loaded. There was no evidence tending to show that the coal was negligently or carelessly loaded. We are clearly of the opinion that no negligence on the part of the company was shown by the witnesses for the plaintiff below, and that the demurrer should have been sustained. The witnessess all agree that the lump of coal first struck the rock ballast or ground, and then bounded and struck Croll, and that Croll was not looking at the train, but was stooped over shoveling. Had he been looking at the train, it is more than likely that he would have seen the lump of coal, and could have dodged it, and thereby escaped injury. He was very careless in not doing so, and he ought not to expect to be recompensed for his carelessness.

The judgment of the district court is reversed, and the cause remanded, with instructions to sustain the demurrer of the defendant below to the evidence of the plaintiff below.

All the Judges concurring.